UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNDER SEAL

                                                 *Plaintiff*,

          --against--

UNDER SEAL
                                           *Defendants*.
------------------------------------------------------------------X

16-CV-7820 (KBF)

**DECLARATION OF**
**ANDREA TANTAROS**

**ANDREA TANTAROS** hereby declares under penalty of perjury:

1. Together with Astero, LLC, I am one of the Defendants in this action.

2. I submit this Declaration in joint support of Defendants' motions (a) pursuant to Fed. R. Civ. P. 65, for an order granting a preliminary injunction prohibiting Plaintiff Michael Krechmer, a/k/a Michael Malice ("Malice"), from violating the confidentiality provision of the Collaboration Agreement between Malice and Defendants, executed May 4, 2015, during the pendency of the sealing order in this case; (b) in support of Defendants' motion to dismiss Malice's Complaint ("Complaint"), which this Court has converted into a motion for summary judgment; and (c) for such other and further relief as this Court deems just and proper.

3. At the outset, I want to make clear that **I never terminated my Collaboration Agreement with Malice. Nor did I ever enter into a new Ghostwriting Agreement with Malice.**

4.      In February of 2014, I entered into a contract with HarperCollins Publishers LLC ("HarperCollins") to write a book entitled "Tied Up in Knots" ("Book"). (Exhibit ("Exh.") A hereto)[1] The contract called for delivery of the Book on October 15, 2014. (*Id.*, at 2)

5.      In October of 2014, HarperCollins and I agreed to extend the deadline for the Book until March 1, 2015. (Exh. B hereto)

6.      In May of 2015, HarperCollins and I orally agreed to push the publication date for the Book back to a later date because, *inter alia,* another Fox News host, Kimberly Guilfoyle had written a Book that Harper Collins had scheduled to be released on May 26, 2015. (*See* Exh. 1 to the accompanying Declaration of Judd Burstein ("Burstein Dec.")) HarperCollins and I therefore agreed that it would not be commercially advantageous for two Fox News hosts who were on the same program to be releasing books at or near the same time. In addition, I had concluded that, given the demands of my television schedule, I needed editorial help on the Book.

7.      In March of 2015, I began exploring the idea of hiring Malice to assist me with the editing and writing of the Book. At the time that we met, I was not told by Malice that his true last name was Krechmer.

8.      Commencing in late March of 2015, Malice and I started discussing in earnest the idea of working together. On March 26, 2015, I sent Malice the following:

---

[1]     All Exhibits referenced herein are Exhibits annexed to this Declaration, and are true and accurate copies of actual documents I signed, sent or received.

2

    a.    A "sample" of my writing in the form of an article that I had written for the New York Daily News. (Exh. C hereto)[2];

    b.    A draft of my introduction to the Book, together with comments from my editor at HarperCollins, Adam Bellow ("Adam" or "Bellow") "so [Malice could] see what [Bellow was] thinking." (Exh. D hereto); and

    c.    Three chapters of my Book that "I did myself with no editing." (Exh. E hereto)

9.    On March 27, 2015, Malice told me during a telephone call that he believed that the Book was "65% done," and that, with his help as a writer and editor, he could help me finish the Book "within a few months."

10.    On March 27, 2015, I sent an email to Bellow stating that "Malice is the guy I need," and that "**[Malice] can act as [a] writer and editor for me. He thinks [B]ook is 65% done in his opinion and can help me finish in a few months.**" (Emphasis in original) (Exh. F hereto) Thus, from the outset, Malice and I discussed that, as part of his duties, I would, in some instances, essentially dictate my ideas to him, he would actually put pen to paper in an initial effort to express my ideas, and I would then edit his work. I understand that Malice alleges in his Complaint that I feared that my editor would discover that I was not writing the Book myself. (Complaint ¶ 20) This email, in which I disclose to my editor (Bellow) that I wanted Malice to work with me (Exh. F hereto), completely refutes that allegation.

---

[2]    The beginning portion of this Exhibit has been redacted to exclude extraneous material. The Court will note that other Exhibits submitted herewith are also redacted for the same reason.

11. On March 30, 2015, I engaged in a series of emails with my agent, Keith Urbahn ("Urbahn"), which consisted, in relevant part, of the following:

    a.    I asked Urbahn to reach out to Malice's agent so that Malice "can help me finish [the] last 30% of the book," and also that "Adam [was] on board.";

    b.    Urbahn responded by asking about

        (i)    The credit that Malice would receive in the Book;

        (ii)    How much Malice should be paid, noting that Malice was probably "looking at between $20k-$50k"; and

        (iii)    A prospective time line for his work.

    c.    I responded by stating that

        (i)    I did not want to provide Malice any credit because "[I had] done so much already," "[I was] still going to be writing parts to finish," and that "[Malice would be] doing writing/editing hybrid," so "[o]ne line in acknowledgments thanking him [would be enough]....";

        (ii)    I wanted to pay Malice the "lower end" of the $20k-$50k referenced by Urbahn because the Book was "65% [to] 70% done already...."

    d.    Urbahn and I agreed that Malice should be given an audition pursuant to which Malice would "edit[] a chapter, expand[], and draw[] out anecdotes and stories from [me], not writing from scratch."

4

      e.      Urbahn and I postulated that, since the Book was 65-70% done, the manuscript could be completed by June or July of 2015.

(Exh. G hereto)

12. On April 3, 2015, Urbahn and Malice's agent, Joseph Veltre ("Veltre"), engaged in an email negotiation in which Veltre demanded a $50,000 fee, which I rejected. (Exh. H hereto)

13. On April 5, 2015, I wrote to my agent, stating that I wanted to hire Malice because "[t]he [other] names that you both have given me are not experienced enough or have the time to write and edit and get this over the finish line in my voice." (Exh. OO hereto)

14. On April 8, 2015, Urbahn reported to me and Bellow that a "tentative agreement" had been reached for the payment of $40,000 to Malice plus an additional $10,000 if the Book made the New York Times ("NYT") Bestseller list. (Exh. I hereto)

15. As of April 12, 2015, with our financial terms set, Malice and I began working together. In an April 12, 2015 email exchange (redacted to exclude extraneous matters), Malice made clear he understood that I was writing the Book because, even though he had drafted part of a chapter, he stated that he wanted to get my draft of that chapter before doing any more work because "[w]e can't have competing documents with differing edits, and I need to edit in one pass[.]" (Exh. J hereto)

16. In an April 12 and 13, 2015 email exchange (also redacted to exclude extraneous matters), I wrote to Malice stating that I had added "a lot of content" to a chapter, but that Malice should thereafter work on the chapter "without stopping." (Exh. K hereto) This request was consistent with Malice's obligations under the Collaboration Agreement

5

17. On April 20, 2015, Urbahn reported to me that the written agreement between Malice and me was completed, and that he was just "waiting on [Malice]'s signature." (Exh. L hereto)

18. On April 21, 2015, I started sending Malice portions of my Book (redacted here for privacy concerns), to which Malice responded "[A]wesome!" (Exh. M hereto)

19. On April 23, 2015, Malice sent me an email enclosing a chapter from my Book with comments. His comments in the draft make clear that he was both editing and writing portions of the chapters. For example, on the first page of the draft, Malice included a comment stating: "Please rewrite this in your voice, this is my draft as setting up the chapter conceptually." On the third page of the draft, Malice, obviously commenting on my writing, comments: "[D]on't leave the present when narrating an event, i.e., 'would forever[.]'" (Exh. N hereto)

20. On May 3, 2015, I sent Malice three chapters of the Book to edit. (Exh. O hereto)

21. On May 4, 2015, the agreement to which Malice and I had agreed on April 20, 2015, was finally executed between Malice and "Andrea Tantaros of Astero[,] LLC". (Exh. P hereto) In relevant part, it provided that:

    a. Malice's duties under the Collaboration Agreement was to "edit and rewrite the [Book]..., including, but not be limited to, writing original material...." (*Id.*, at § 2.1);

    b. Payment of $40,000 to Malice on the following schedule:

        i. $5,000 upon execution of the Collaboration Agreement;

        ii. $10,000 once HarperCollins and I reviewed and were satisfied with

                    one chapter of the Book;

       iii.     $10,000 upon delivery of a manuscript totalling not less than 75,000 words to HarperCollins;

       iv.     $15,000 upon HarperCollins's acceptance of the manuscript; plus

       v.     An additional $10,000 if the Book were listed on the printed NYT Bestseller list

(*Id.*, at § 3.2);

    c.     The Book and any derivation of it belonged solely to me (*Id.*, at § 4);

    d.     Malice was "providing writing services to [me] for [my] sole use," and Malice was "relinquish[ing] all rights to [the Book] and any subsequent proceeds derived therefrom." (*Id.*, at § 5.1);

    e.     Notices were to be given in a specific manner (*Id.*, at § 9);

    f.     Confidentiality was an "essential" part of the Agreement (*Id.*, at § 10); and

    g.     In the event of termination of the agreement by either party, I would be obligated to pay Malice an amount "equivalent" to the amount of work then provided and to reimburse all existing expenses; and

    h.     The Agreement could only be modified in a writing signed by the party to be charged. (*Id.*, at § 12)

22.     On May 4, 2015, I sent Malice draft of (a) another chapter I had written for my Book, and (b) an unfinished chapter I also wrote for my Book. (Exh. Q hereto)

23.     On May 6, 2015, Malice sent an email to me, attaching one of my Book chapters with his proposed edits. (Exh. R hereto)

24. On May 19, 2015, I sent Malice a draft of another chapter I had written for my Book. (Exh. S hereto)

25. On May 25, 2015, I sent Malice (a) a revised outline for the Book, and (b) a draft of yet another chapter I had written for the Book. (Exh. T hereto)

26. Also on May 25, 2015, I sent Malice a proposed outline for the Book which contained the proposed chapter titles and the thoughts that I wanted to convey in each chapter. (Exhibit KK hereto)

27. On June 3, 2015, Malice sent me an email attaching his proposed edits and comments on a chapter of the Book that I had written. (Exh. U hereto)  Exh. U demonstrates that Malice edited my written work by highlighting text for the purpose of suggesting edits, making comments and asking questions.

28. On June 18, 2015, I sent Malice a draft of another chapter I had written. (Exh. V hereto)

29. On June 29, 2015, Malice, in accordance with his obligations under the Collaboration Agreement, sent me an email outlining a proposed structure of a chapter on Tinder that I was writing. (Exh. W hereto)

30. In July of 2015, Malice asked for an advance on the payment due to him under the Collaboration Agreement because (a) it was clear that the manuscript of the Book needed more work, thereby delaying money that Malice had expected to be paid by July, (b) HarperCollins and I had decided to push the deadline for the manuscript back, thereby also delaying payment to Malice, and (c) Malice was celebrating his birthday in July. (Exh. 2 to Burstein Dec.) **At no time did we discuss terminating the Collaborating Agreement, and**

**entering into a new agreement. To the contrary, the Collaboration Agreement was never terminated, and Malice and I never entered into a new agreement. Nor did we ever discuss, much less agree, on a change in Malice's compensation.** Rather, the only change I agreed to was to pay Malice money in advance of the time that money was due under the Collaboration Agreement.

31. On July 27, 2015, I sent Malice yet another proposed portion of the Book. (Exh. X hereto)

32. On July 30, 2015, I wrote a $15,000 check to Malice, using his real name, Michael Krechmer. Instead of referencing a new agreement with Malice, the memo line of the check stated "Happy Birthday!"

33. I never agreed to terminate the Collaboration Agreement.

34. I never entered into the Ghostwriting Agreement alleged in the Complaint or any other agreement with Malice other than the Collaboration Agreement.

35. Contrary to Malice's claim that "[o]n or about July 21, 2015, Ms. Tantaros informed Mr. Malice that she was too busy to do any additional writing on *Tied Up in Knots* and asked him to ghostwrite it. The factual content would be based upon Plaintiff Malice's interviews with her, but the prose itself, being the creative elements of the [B]ook, would be authored by Mr. Malice," (Plaintiff's Statement of Additional Material Facts ("the Malice Statement", at ¶ 23), there was no change in the manner in which Malice and I worked thereafter. To the contrary, during the period prior to July of 2015, I had at times sat with Malice, dictated my ideas, and then waited for him to provide me with an initial draft of written work, which I then edited. Nonetheless, I still wrote the first draft of most of the Book.

9

36. On August 5, 2015, I provided Malice with a detailed outline of the Book with names of chapters and the ideas I wanted to convey. (Exhibit 21 to the Malice Statement)

37. On August 31, 2015, Malice sent me his edits and comments on 111 pages of the Book that I had authored (Exh. Y hereto) and which I had previously provided to Malice. That Malice was editing my writing is demonstrated by his numerous comments and suggested edits throughout the document. (*Id.*, at 2, 5, 9, 17, 36, 44, 48, 63, 70, and 92)

38. On September 10, 2015, Malice sent me his edits and comments on an additional 104 pages of the Book that I had authored. (Exh. Z hereto) That I had written this part of the Book is shown by the fact that I had previously sent Malice significant portions of what I sent on September 10, 2015 via email. For example, a prior version of Chapter 2 of Exhibit Z (beginning at page 27 thereof) had previously been sent by me to Malice more than 5 months earlier on March 26, 2015. (Exh. E hereto) Similarly, a prior version of Chapter 3 of Exhibit Z (beginning at page 43 thereof) had previously been sent by me to Malice approximately four months earlier on May 3, 2015. (Exh. O hereto) In addition, the first chapter of Exhibit Z was a version of a "Marriage Chapter" that I had sent to Malice almost three months earlier on June 8, 2015. (Exh. Y hereto) Finally, the fact that that Malice was editing my writing is further demonstrated by his editorial comments and suggestions found at pages 27, 32, 73, 79, 80, and 81-82 of Exhibit Z.

39. On September 18, 2015, I sent an email to Malice, stating that I was doing substantial editing of the edited versions of the Book that Malice had sent to me on August 31, 2015 and September 10, 2015. (Exh. AA hereto)

40. On September 23, 2015, I sent an email to Malice containing a rewrite of part of the Book. (Exh. BB hereto)

41. On September 27, 2015, I wrote to Malice informing him that the "TMI Chapter was done," and attached a version of it. (Exh. NN hereto) Malice responded: "fuck yes, keep it coming Andrea," to which I replied: "When you send them back please send each chapter as separate word docs. I won't start doing round two/final round of edits until I finish round one of all chapters." (*Id.*)

42. On September 28, 2015:

    a. Malice sent an email to me attaching a portion of the Book that I had authored, stating: "[T]his is excellent." (Exh. CC hereto)

    b. Malice sent an email to me agreeing with my idea to add a portion of a NYT article to the Book. (Exh. DD hereto)

    c. I sent Malice an email stating that I had added "a ton" to the Book, but "just need[ed] [him] to move a big chunk up front," to be followed by a chapter entitled "Too Cool." (Exh. EE hereto) "To Cool to Care" was part of the Exhibit Y, the section of the Book that Malice had edited and sent back to me on August 31, 2015. (Exh. Y hereto)

43. On September 29, 2015, Malice sent an email to me containing a newly edited version of a chapter entitled "Information Society." (Exh. FF hereto) I had written the original version of this chapter, which was included in the portion of the manuscript that I had sent to Malice on August 31, 2015. (Exh. Y hereto at 36-51)

11

44. On September 30, 2015, I sent an email to Malice, stating that "[t]hese chapters keep getting better the more we go back and forth." (Exh. GG hereto)

45. On September 29, 2015, I sent Malice an email discussing a part of my "To Cool to Care," chapter, and stating that "after I pour my heart out ... you need to reorganize the content. It's all there, just needs your skills so it flows and crescendos the way it should." (Exh. HH hereto)

46. On September 30, 2015, Malice responded to my request by sending me an edited version of "Too Cool to Care." (Exh. MM hereto). The chapter was a rewrite of sections of the Book that I had written.

47. On October 4, 2015, I sent an email to Malice stating that I had "[e]dited Hive a little but needs way more. Gonna leave it alone though. Just finished marriage. Took me a few hours [because] I really got into it. Will tackle kindness tomorrow." (Exh. II hereto)

48. On December 11, 2015, Malice sent me a list of 12 issues I needed to address in the Book. On January 5, 2016, I responded to those 12 issues, noting that "I owe you the intro.". (Exh. JJ hereto)

49. On January 12, 2016, Malice sent a redraft of the introduction to the Book that I had promised him I would draft, to which I replied by stating that I "needed to change a few things." (Exh. LL hereto)

50. On April 26, 2016, my Book was published. (Exh. PP hereto) As demonstrated above, I wrote the initial drafts of most of the Book. To the extent that I did not write the initial drafts of some chapters, I used Malice, who was obligated under the Collaboration Agreement to write original material, to take my spoken words and turn them into parts of the Book.

12

51.     The first time that I ever learned that Malice was claiming that, in July of 2015, the Collaboration Agreement had been terminated and replaced by a new Ghostwriting Agreement was on or about October 6, 2016, when the Complaint in this action was filed.

52.     In his Complaint, Malice alleges that I owe him additional monies under the Collaboration Agreement.  (Complaint ¶¶ 42-43, 45-46)  My position is that Malice is not entitled to more monies because he breached the confidentiality provision of the Collaboration Agreement multiple times.  He did so by advertising on his business website that he was my "writing coach," and by posting pictures of me on his business website and Instagram and Facebook pages, thereby suggesting there was a business relationship between the two of us during the period in which I was writing my Book.  He did all of this without my knowledge or consent.  For example, while I was recording the audio portion of my Book, he took a picture and posted it to his Instagram page without my consent.  During the writing process, he was also talking directly with my Fox News colleagues and others, sharing not only that he was assisting with the Book, but also very personal and private information that he learned during the collaborative process.  (Malice is an occasional guest on certain Fox News programs and expressed numerous times his desire to have increased airtime and a television career at Fox News).  Upon suspicion he was sharing such information, I had to verbally reprimand him twice, and remind him that he was subject to a confidentiality agreement and that speaking to Fox News employees or anyone about the Book, its content, or any personal information about me was strictly prohibited.

53.     Malice also alleges in his Complaint that I attempted to defraud my literary agent, and that my inability to do so spurred my attempts to defraud, threaten, and harass him.

13

(Complaint ¶ 52) This is false. I never made any attempt to defraud my literary agent, or to defraud threaten, or harass Malice.

54. I also deny Malice's allegation that I acknowledged that he did not breach the confidentiality portion of the Collaboration Agreement by attempting to have him sign an affidavit disclaiming breach. (Complaint ¶ 65) Rather, I offered to have him sign this affidavit because I knew he had breached the confidentiality portion of the Collaboration Agreement, and would not sign for that reason. I wanted his refusal to sign such an affidavit to serve as additional proof of his breach.

55. I also note that certain "evidence" presented by Malice in his recent submission supports my claims here. While, as I understand it, this evidence cannot be used by Malice for his benefit, it is available for me to use to show the absurdity of Malice's arguments.

56. **First**, at Paragraph 11 of his counsel's statement of undisputed facts ("Malice Statement"), Malice intentionally misrepresents the terms of the Collaboration Agreement by omitting the fact that Section 2.1 of that Agreement expressly obligated him to "writ[e] original material."

57. **Second**, contrary to Paragraph 19 of the Malice Statement, Exhibit 11 to the Malice Statement not only fails to demonstrate that the chapter referenced in that exhibit was "one of the last chapters [I] would attempt to write," the facts show that, after the June 18, 2015 email enclosing that chapter, I continue to write significant portions of the Book. (*See* ¶¶ 35-37, 40, 42 and 44 above)

58. **Third**, Paragraphs 40-41 of the Malice Statement misrepresent a text conversation that Malice claims we had in which I supposedly acknowledged that Malice had

14

taken on the job of my ghostwriter. This is an absurd claim because the texts (found at page 15 of Exh. 12 of the Malice Statement) make clear that the "job" to which Malice was referring was his job as my "friend" to "make ... right" "injustices" I had suffered. Since my Book deals with female empowerment, rather than injustices I have endured, Malice's comment plainly had nothing to do with my book.

59.     **Fourth**, Exhibit 33 to Malice's Statement, at page 20, demonstrates that his claim about a new Ghostwriting Agreement is an entire fraud. In the chat that Malice has annexed to his submission, he claims that, upon my accepting the manuscript so that it could be sent to HarperCollins, I only owed him $10,000.

60.     **Fifth**, the reference to "mapping out of payments" in that same conversation is not, as claimed at Paragraph 78 of the Malice Statement is **not** an indication of my agreement to a new Ghostwriting Agreement. Rather, Malice and I are plainly speaking about the fact that the **Collaboration Agreement** provides for one payment to be made when the book is submitted to HarperCollins, and a second payment when Harper Collins accepts the manuscript; this is clear because Malice and I are speaking about how my agent, Keith Urbahn structured the deal: "[T]hey structured it so theres (*sic*) one check when you are happy and another when [my editor at Harper Collins] is happy." This conversation could not have been about my supposed (but non-existent) Ghostwriting Agreement with Malice because Paragraphs 25-28 of the Malice Statement allege that Malice and I worked out the Ghostwriting Agreement privately. Hence, we could not have been discussing the Ghostwriting Agreement as something that my agent had worked out with my editor.

15

61. **Sixth**, paragraph 108 of Malice's Statement alleges that I continued to include Malice in discussions regarding promotion of the Book after I claimed he breached the Collaboration Agreement. This is false. Malice was not engaged or involved in active Book promotion at any time. Once I learned conclusively that he had breached the Collaboration Agreement he was never copied on any further document.

62. Lastly, it is critical that Malice not be permitted to violate the confidentiality clause of the Collaboration Agreement and falsely claim that he is the author of the Book. The confidentiality clause of the Collaboration Agreement states as follows:

> Client's confidentiality **is essential to this agreement**. Collaborator may not discuss or mention his involvement in the work in any venue without prior approval, in writing, from Client. Confidential Information means any non-public information disclosed by Client to Collaborator. Client's Confidential Information will be held in confidence by Collaborator and will not be disclosed to any third party or otherwise made public. Collaborator will: (a) not use the Confidential Information for any purpose other than in the performance of its obligations under this Agreement; (b) take all reasonable and necessary steps to ensure that its employees, principals, officers, agents, and contractors, representatives who have access to Confidential Information comply with Collaborator's obligations pursuant to this Section; (c) disclose any Confidential Information as required in response to a valid court order or other legal process, but only to the extent required by that order or process and only after Collaborator has provided Client with written notice and the opportunity for Client to seek a protective order or confidential treatment of such Confidential Information (with the reasonable assistance of Collaborator, if Client so requests); and (d) return all Confidential Information to Client or destroy the same, at the Client's request, by no later than fifteen (15) calendar days after such request or when Collaborator no longer needs Confidential Information for its purposes.

(Exh P hereto at ¶ 10) (emphasis supplied).

63. My chosen career as a journalist and author is extremely important to me, and my success in that career is dependent upon my credibility – indeed, it is my most valuable asset. It would destroy my credibility if Malice were permitted to publicly and falsely state that he is the

16

author of the Book. The damage caused to my career by his absurd claims would be so great that it would be impossible to measure in monetary terms, and would even threaten my ability to continue my career as a journalist and author. The effect of such claims would be especially severe now, after the Book has been published, because I would be forced to face questions from the public, my colleagues, my publisher, and the news media about a blatantly false claim. Even having to defend such an outrageous lie would call into question my integrity. Accordingly, I would be irreparably harmed if Malice were permitted to falsely state that he wrote the Book. Therefore, the confidentiality clause in the Collaboration Agreement is an essential provision of the Agreement, and without it I would not have entered into the Agreement.

[INTENTIONALLY LEFT BLANK]

I declare (under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 21, 2016.

_____
ANDREA TANTAROS