UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

MICHAEL KRECHMER, a/k/a
"Michael Malice," an individual,

                              Plaintiff,

        -against-

ANDREA K. TANTAROS, an individual;
and ASTERO, LLC, a New Jersey limited
liability company,

                              Defendants.

------------------------------------------------------------x

## 16 CV  7820

Case No.: _____

**VERIFIED COMPLAINT
AND JURY DEMAND**

**JUDGE FORREST**

        Plaintiff Michael Krechmer (a/k/a Michael Malice) ("Malice"), by and through his counsel of record, Randazza Legal Group, PLLC, hereby complains against Defendants Andrea K. Tantaros ("Tantaros"), and Astero, LLC ("Astero") as follows:

### THE PARTIES

        1.      Plaintiff Michael Malice is an author, ghostwriter, columnist, and political commentator. He has co-authored two *New York Times* best selling books.

        2.      Defendant Andrea Tantaros resides and does business in the County, City and State of New York and is a well-known conservative political analyst and commentator.  She was one of the original co-hosts of the Fox News television program *The Five* and was one of the hosts of the Fox News television program *Outnumbered* until she was suspended from the network in April of 2016.

        3.      Defendant Astero, LLC, is a New Jersey limited liability company controlled by Ms. Tantaros that manages her business affairs and, at all relevant times herein, conducted business in the State of New York.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338, as this case arises under the United States Copyright Act, including the Digital Millennium Copyright Act, and the Declaratory Judgments Act.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the other claims as they are part of the same case and controversy.

5.      This Court has personal jurisdiction over Defendant Andrea K. Tantaros because she is a resident of this judicial district.  Defendant Tantaros otherwise consented to personal jurisdiction in the State of New York.

6.      This Court has personal jurisdiction over Defendant Astero pursuant to N.Y. CPLR § 302(a) because it transacts business in the State of New York, committed the tortious acts described herein in the State of New York, and regularly does and solicits business and derives substantial revenue for services rendered in the State of New York.  Defendant Astero otherwise consented to personal jurisdiction in the State of New York.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and/or (c).

## FACTS COMMON TO ALL CLAIMS

8.      On or about April 2, 2015, representatives for Ms. Tantaros and Astero contacted Plaintiff Malice's representatives because Ms. Tantaros had intended, for about two years, to write a book, *Tied Up in Knots,* without making any significant progress.

9.      According to Defendants' representatives, Ms. Tantaros was in need of a writing coach and editor to guide her through the writing process, which she had not yet begun in earnest.

10.      Malice agreed to assist Defendants in writing the book, provided that he receive some written acknowledgment for his work.

11.      On or about May 4, 2015, Malice signed a Collaboration Agreement with Ms. Tantaros and Astero.  The Collaboration Agreement provided that Mr. Malice would "edit and rewrite" *Tied Up in Knots* in a manner satisfactory to Ms. Tantaros and her publisher, HarperCollins.  A true and correct copy of the Collaboration Agreement, as executed, is attached hereto as Exhibit 1.

12.     While he would not be credited for his work on the book, he would be thanked by name in its acknowledgements.

13.     Mr. Malice was to be paid for his work pursuant to the Collaboration Agreement as follows:

      a.   $5,000 upon execution of the Collaboration Agreement;

      b.   $10,000 once Ms. Tantaros and HarperCollins reviewed and approved of one chapter edited by Mr. Malice;

      c.   $10,000 upon delivery of the manuscript to HarperCollins;

      d.   $15,000 upon acceptance of the manuscript by HarperCollins; and

      e.   $10,000 if the book was listed on the *New York Times* best seller list.

14.     The initial $5,000 payment was provided to Mr. Malice when he executed the Collaboration Agreement.

15.     Following the execution of the Collaboration Agreement, Mr. Malice began work on the book immediately.  Defendant Tantaros struggled to produce anything for Mr. Malice to edit.

16.     In mid-June, 2015, Defendants paid Mr. Malice the $10,000 payment for his delivery and their approval of a chapter of *Tied Up in Knots*.

17.     On or about July 21, 2015, Ms. Tantaros informed Mr. Malice that she was too busy to do any additional writing on *Tied Up in Knots* and asked him to ghostwrite it.  The factual content would be based upon interviews with her, but the prose itself, being the creative elements of the book, would be authored by Mr. Malice.

18.     On or about July 22, 2015, Mr. Malice responded to her suggestion.  He pointed out that her suggestion went far beyond his initial tasks on the book and that the rate he was being paid in the Collaboration Agreement was far less than he would have received as a ghostwriter.

19.     Mr. Malice suggested that Ms. Tantaros and Astero contact Mr. Malice's agent to negotiate a new deal.

20.     When Mr. Malice suggested that Defendants contact his agent, Defendants became agitated because they feared that it would cause her editor to discover that she was not writing the book herself.

21.     Defendants feared that HarperCollins would cancel the book if they discovered that there were any new negative issues in the writing process, particularly since she was already running more than two years behind schedule.

22.     Defendants feared that Ms. Tantaros would suffer professional repercussions and personal humiliation if her colleagues at Fox News discovered that the publication agreement with HarperCollins was cancelled.

23.     Ms. Tantaros instead proposed a new oral agreement with Mr. Malice, terminating the Collaboration Agreement, whereby she would pay Mr. Malice to ghostwrite the book.

24.     He agreed.

25.     Specifically, he agreed to ghostwrite the book for 30% of Ms. Tantaros' $500,000 advance, making his share $150,000.

26.     She agreed.

27.     The monies that Mr. Malice had been paid pursuant to the Collaboration Agreement would be credited to the amounts he was owed under the new, oral Ghostwriting Agreement.

28.     The Ghostwriting Agreement did not contain an express written agreement that the work to be performed by Mr. Malice should be considered a work made for hire.

29.     No written instrument signed by Plaintiff and Defendants exists stating that the work to be performed by Mr. Malice under the Ghostwriting Agreement should be considered a work made for hire.

30.     The Ghostwriting Agreement did not contain an instrument of conveyance or a note or memorandum of a transfer of copyright in the work to be performed by Mr. Malice under the Ghostwriting Agreement.

31.    No written instrument of conveyance or note or memorandum of a transfer of copyright in the work performed by Mr. Malice under the Ghostwriting Agreement, signed by Mr. Malice or his agent, exists.

32.    The parties agreed to incorporate the payment schedule of the Collaboration Agreement into the Ghostwriting Agreement.

33.    No other provisions of the Collaboration Agreement were incorporated into the Ghostwriting Agreement.

34.    Immediately after making their binding oral agreement, Ms. Tantaros sent Mr. Malice a text message: "I feel so much better and even more so that I have not just gained a writer but a friend."

35.    On July 27, 2015, Michael Malice sent Defendants an email instructing that the new payments for ghostwriting would need to be addressed to his legal name (Michael Krechmer) and not his professional name (Michael Malice).

36.    On or about July 30, 2015, Defendants made a first payment of $15,000 to Mr. Malice under the Ghostwriting Agreement.

37.    Unbeknownst to him at the time, this was the last payment Mr. Malice would receive from Defendants.

38.    Thus, the total paid to Mr. Malice under the agreements was $30,000.

39.    For several months, Mr. Malice's writing of *Tied Up in Knots* proceeded smoothly. He interviewed Tantaros and then wrote the book, providing her with chapters to review after he completed them.

40.    Ms. Tantaros consistently informed Mr. Malice regarding how thrilled she was with his writing of the book, at one point telling him "after reading the book manuscript I actually ███████"

41.    On October 4, 2015, Mr. Malice delivered to Defendants and HarperCollins a completed copy of the manuscript of *Tied Up in Knots* he had written.

42.     This acceptance triggered the next payment due under the Collaboration Agreement.

43.     Defendants did not make that payment.

44.     On January 20, 2016, HarperCollins announced that it would be sending copies of *Tied Up in Knots* to reviewers.  This confirmed that, despite some remaining copy editing, the publisher had officially accepted the manuscript.

45.     This acceptance triggered yet another payment due under the Collaboration Agreement.

46.     Once more, Defendants failed to make payment.

47.     At the time, Mr. Malice was unaware that Defendants would issue no further payments to him pursuant to the Agreements.

48.     In early February 2016, Ms. Tantaros discussed the acknowledgements for *Tied Up in Knots* with Mr. Malice.  Initially, she told Mr. Malice that she was going to identify him as the "King of Awesomeness" but it eventually said, "I'm eternally thankful to my editor, coach, and buddy, Michael Malice: you restored my faith in people.  Even Russians."

49.     On February 21, 2016, Defendant Andrea Tantaros again emailed Mr. Malice to convey Defendants' appreciation for his ghostwriting services, stating "MM, thank you for your attention to making this perfect.  You are a trusted friend and angel.  You have given me peace of mind when others haven't and I am eternally appreciative of how you have completed my vision and dream, by keeping every promise you made.  Nobody is like you."

50.     HarperCollins repeated Defendants' thanks the next day when Defendant Tantaros' editor emailed Mr. Malice, telling him, "I really appreciate your dedication to this project.  Without you, we wouldn't have a book at all."

51.     In late February 2016, Ms. Tantaros informed Mr. Malice that Defendants had unilaterally decided that her literary agent was in breach because he was "useless" and attempted to have HarperCollins send future payments directly to her, rather than to him.  As it was contrary to the terms of her agreement with HarperCollins, the publisher refused to honor her demand.

52.     Ms. Tantaros' inability to defraud her literary agent initiated her attempts to defraud, threaten, and harass Michael Malice.

53.     After receiving no additional payment since July 30, 2015, despite the delivery of the manuscript to Defendants and HarperCollins, as well as the acceptance of the manuscript by HarperCollins, Mr. Malice emailed Defendants on March 2, 2016, which detailed how payments should be apportioned relative to the initial Collaboration Agreement and the subsequent Ghostwriting Agreement.

54.     On March 17, 2016, Ms. Tantaros emailed Mr. Malice that she was preparing financial disbursements for the *Tied Up in Knots* book and attached a non-disclosure agreement that she demanded he sign, stating that she's "having everyone who was involved in the process" sign it.

55.     Upon information and belief, no one else was requested to sign such a non-disclosure agreement.

56.     Mr. Malice was not obligated to sign a non-disclosure agreement and it provided no consideration to which he was not otherwise entitled.

57.     The proffered non-disclosure agreement was overly broad: not only was it retroactive to January 1, 2016, but it also forbade Mr. Malice from discussing or mentioning anyone associated with Ms. Tantaros, even if the information was public knowledge.

58.     It additionally forbade Mr. Malice from disclosing that he had initially agreed to be the editor of *Tied Up in Knots* or that he worked on the book in any capacity, even though, at a minimum, the acknowledgements section of the published book and the Collaboration Agreement made such disclosure.

59.     Finally, the proffered non-disclosure agreement contained a $500,000 liquidated damages provision, even though compliance with its terms was literally impossible.

60.     Mr. Malice did not sign the non-disclosure agreement.

61.     On March 21, 2016, Ms. Tantaros again emailed Mr. Malice that she was preparing to attend a disbursement meeting and needed the executed non-disclosure agreement prior to that

7

meeting.   Neither the Collaboration Agreement nor the Ghostwriting Agreement required the execution of any further agreements in order that Mr. Malice be paid either the past-due amounts or the amounts to be paid.

62.   Mr. Malice inferred that the email was meant to inform him that he would not be paid if he did not sign the onerous non-disclosure agreement.  He was, unfortunately, correct.

63.   On March 28, 2016, Mr. Malice received an email from Defendants, through their counsel, accusing him of disclosing "confidential information" in breach of the Collaboration Agreement.  Defendants did not and would not specify what "confidential information" Mr. Malice was allegedly disclosing or who was allegedly receiving "confidential information" from Mr. Malice.

64.   Defendants' counsel unethically demanded that, if he wished to avoid a lawsuit, Mr. Malice sign the non-disclosure agreement and an affidavit stating that he had not breached the Collaboration Agreement by the close of the next business day.

65.   By demanding the signature on an affidavit disclaiming breach, Defendants' counsel, on behalf of Defendants, admitted that Mr. Malice had not breached the Collaboration Agreement.

66.   Since Defendants' attorney had already knowingly and falsely accused Mr. Malice of breaching the Collaboration Agreement, Mr. Malice believed Defendants were likely to sue him regardless of whether he signed the non-disclosure agreement and the affidavit.

67.   HarperCollins published *Tied Up in Knots* on April 26, 2016 (hereinafter "the published book").

68.   The published book falsely states that Defendant, Andrea Tantaros is the author of *Tied Up in Knots*.

69.   The published book contains a false notice of copyright identifying Defendant Andrea Tantaros as the copyright owner.

70.   Defendants caused the published book to falsely identify Andrea Tantaros as the author.

71.     On April 27, 2016, the very next day, Fox News announced that it was suspending Ms. Tantaros for unspecified reasons.

72.     However, in litigation between Defendant Tantaros and Fox News, Fox News pleaded that she was actually suspended on April 25, 2016 "in accordance with the terms of her Employment Agreement because of her failure to obtain approval of her book." See *Tantaros v. Fox News Network, LLC, et al.*, Index No. 157054/2016 (Supreme Ct. of N.Y, N.Y. County. Aug. 29, 2016) (Memorandum at p. 5).

73.     At no time before or in the course of Plaintiff's work writing the published book did Defendants inform him that Tantaros would likely be sanctioned by her employer, Fox News Network, for violating the terms of her Employment Agreement, with the result that such sanction would jeopardize her ability to promote the sale of the published book.

74.     Without a television platform for Ms. Tantaros to promote the sale of the published book, it is unlikely the published book will become a New York Times Bestseller, entitling Plaintiff to additional payment under the agreements.

75.     On May 27, 2016, Plaintiff made demand of Defendants to make all payments due and owing under the agreements.

76.     As of the filing of this Complaint, Defendants have not paid Mr. Malice the remaining $120,000 owed under the agreements.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Declaratory Judgment – 28 U.S.C. § 2201
### *Against Defendants Tantaros and Astero*

77.     Plaintiff Michael Malice repeats and realleges each and every allegation as if set forth fully herein.

78.     Plaintiff Michael Malice authored the book *Tied Up in Knots* and is thus the owner of the copyright in that book. The book was not written by Mr. Malice as a work made for hire, nor was the copyright in the book assigned to Defendants.

79.     The book was written by Mr. Malice pursuant to the terms of the Ghostwriting Agreement, an oral agreement containing no assignment or work-for-hire provision.

80.     Moreover, even if it was a work made for hire, Defendants never fully compensated Mr. Malice for authoring the book in breach of the Collaboration Agreement and Ghostwriting Agreement.

81.     Such breach is so material and substantial, affecting the essence of the agreements, defeating the objects of the parties, such that any assignment or work-for-hire provision should be deemed rescinded.

82.     Defendants submitted the book to publisher HarperCollins as though the book was written by Defendant Tantaros, who has publicly claimed that she was the author and owns the copyright in the book.

83.     Relying upon Defendants' misrepresentations that Ms. Tantaros wrote *Tied Up in Knots*, HarperCollins published the book, promoting Ms. Tantaros as its author and owner of the copyright.

84.     As Plaintiff is the actual author and copyright owner, an actual controversy exists between Plaintiff and Defendants.

85.     Because Defendant Tantaros is misidentified as the copyright owner, Plaintiff is impaired in his ability to license the work.

86.     Because Defendant Tantaros is misidentified as the copyright owner, Plaintiff is impaired in his ability to pursue infringers.

87.     Because Defendant Tantaros is misidentified as the copyright owner, Plaintiff is impaired in his ability to pursue compensation from HarperCollins as a third-party beneficiary of its agreement with Defendants.

88.     Under 28 U.S.C. 2201(a), Plaintiff is entitled to a declaration that he is the true author and copyright owner regarding the published book.

**SECOND CLAIM FOR RELIEF**
**Violation of the Digital Millennium Copyright Act (17 U.S.C. § 1202)**
***Against Defendants Tantaros and Astero***

89.     Plaintiff Michael Malice repeats and realleges each and every allegation as if set forth fully herein.

90.     Pursuant to 17 U.S.C. § 1202(c)(2) & (3), copyright management information includes the name of, and other identifying information about, the author of a work and the name of the copyright owner of a work, including the information set forth in a notice of copyright.

91.     At all times relevant herein, the copyright management information appearing in the published book declared Defendant Tantaros, not Mr. Malice, was the author, as set forth on the title page.  A true and correct copy of the said title page appears at Exhibit 1, attached hereto.

92.     At all times relevant herein, the copyright management information appearing in the published book declared Defendant Tantaros, not Mr. Malice, was the copyright owner, as set forth in the notice of copyright.  A true and correct copy of the said notice of copyright appears at Exhibit 2, attached hereto.

93.     Such copyright management information appearing in the published book was, therefore, false.

94.     At all relevant times herein, Defendants knew Ms. Tantaros was not the owner of the copyright in the published book.

95.     At all relevant times herein, Defendants knew Ms. Tantaros was not the author of the published book.

96.     By causing the publication of and providing the false copyright management information in the published book, Defendants intended to enable, facilitate, and/or conceal its infringement of Plaintiff's copyright.

97.     Such provision of false copyright management information violated 17 U.S.C. § 1202(a).

98.     Upon information and belief, Defendants' acts in violation of 17 U.S.C. § 1202(a) were willful.

11

99.     By reason of Defendants' violations of 17 U.S.C. § 1202(a), Mr. Malice has sustained and will continue to sustain harm.

100.    Further irreparable harm is imminent as a result of Defendants' conduct, and Mr. Malice is without an adequate remedy at law.

**THIRD CLAIM FOR RELIEF**
**Breach of Contract – Collaboration Agreement**
***Against Defendants Tantaros and Astero***

101.    Plaintiff Michael Malice repeats and realleges each and every allegation as if set forth fully herein.

102.    On or about May 4, 2015, Plaintiff and Defendants entered into a Collaboration Agreement, whereby Defendants agreed to compensate Mr. Malice for editing and rewriting a book Defendant Tantaros was writing entitled *Tied Up in Knots*.

103.    The Collaboration Agreement is valid and binding.

104.    Plaintiff has performed in full all of his obligations, covenants, and conditions contained in the Collaboration Agreement, except for those obligations, covenants, and conditions from which he has been lawfully excused from performing.

105.    Defendants have breached the Collaboration Agreement by failing to compensate Plaintiff pursuant to the terms of the Collaboration Agreement.

106.    This dispute is not about the amount of work provided by Plaintiff pursuant to the Collaboration Agreement; it is about Defendants' failure to compensate Plaintiff for his full performance of the work.

107.    As a direct and proximate result of Defendants' breaches of the Collaboration Agreement, Plaintiff Malice has been damaged at an amount to be determined at trial.

108.    Plaintiff has been forced to retain legal counsel to pursue his rights and seeks recovery of his attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
### Breach of Contract – Ghostwriting Agreement
### *Against Defendants Tantaros and Astero*

109.    Plaintiff Michael Malice repeats and realleges each and every allegation as if set forth fully herein.

110.    In or around July of 2015, Plaintiff and Defendants entered into the Ghostwriting Agreement, whereby Plaintiff agreed to write the book *Tied Up in Knots* for Defendants in exchange for compensation.

111.    The Ghostwriting Agreement is valid and binding.

112.    Plaintiff has performed in full all of his obligations, covenants, and conditions contained in the Ghostwriting Agreement, except for those obligations, covenants, and conditions from which he has been lawfully excused from performing.

113.    Defendants have breached the Ghostwriting Agreement by failing to compensate Plaintiff pursuant to the terms of the Ghostwriting Agreement.

114.    As a direct and proximate result of Defendants' breaches of the Ghostwriting Agreement, Plaintiff Malice has been damaged at an amount to be determined at trial.

115.    Plaintiff has been forced to retain legal counsel to pursue his rights and seeks recovery of his attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith
### and Fair Dealing – Collaboration Agreement
### *Against Defendants Tantaros and Astero*

116.    Plaintiff Michael Malice repeats and realleges each and every allegation as if set forth fully herein.

117.    Under applicable law, the Collaboration Agreement contained an implied covenant of good faith and fair dealing.

118.    By their actions, omissions, and/or false representations, Defendants violated the implied covenant of good faith and fair dealing.

119.   As a direct, proximate, and legal result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff Michael Malice has been injured in an amount to be proven at trial.

120.   Plaintiff Malice has been forced to retain legal counsel to pursue his rights under the terms of the Collaboration Agreement and seeks recovery of his attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
**Breach of the Implied Covenant of Good Faith**
**and Fair Dealing – Ghostwriting Agreement**
***Against Defendants Tantaros and Astero***

121.   Plaintiff Michael Malice repeats and realleges each and every allegation as if set forth fully herein.

122.   Under applicable law, the Ghostwriting Agreement contained an implied covenant of good faith and fair dealing.

123.   By their actions, omissions, and/or false representations, Defendants violated the implied covenant of good faith and fair dealing.

124.   As a direct, proximate, and legal result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff Michael Malice has been injured in an amount to be proven at trial.

125.   Plaintiff Malice has been forced to retain legal counsel to pursue his rights under the terms of the Ghostwriting Agreement and seeks recovery of his attorneys' fees and costs.

**PRAYER FOR RELIEF**

Plaintiff Michael Malice respectfully requests that this Court hereby:

1.   Enter a judgment declaring that:

    (a)   Mr. Malice is the actual author of the published book *Tied Up in Knots*;

    (b)   Mr. Malice is the copyright owner of the published book *Tied Up in Knots;*

    (c)   Defendants Tantaros and Astero willfully violated the express terms of the Collaboration Agreement;

14

> (d)     Defendants Tantaros and Astero willfully violated the express terms of the Ghostwriter Agreement;
>
> (e)     Defendants Tantaros and Astero willfully violated the implied covenant of good faith and fair dealing with respect to the Collaboration Agreement; and
>
> (f)     Defendants Tantaros and Astero willfully violated the implied covenant of good faith and fair dealing with respect to the Ghostwriter Agreement;

2.     Temporary and permanent injunctions restraining Infinity from engaging in further violations of 17 U.S.C. § 1202(a) under 17 U.S.C. § 1203(b);

3.     An award of Defendants' profits derived from their violations of 17 U.S.C. § 1202(a) and Plaintiff's actual damages in accordance with 17 U.S.C. § 1203(c)(2);

4.     Alternatively, if Plaintiff so elects, an award of statutory damages for each violation under 17 U.S.C. § 1202 in accordance with 17 U.S.C. § 1203(c)(3)(b);

5.     An award of Plaintiff's full costs including a reasonable attorney's fee under 17 U.S.C. § 1203(b)(4) & (5);

6.     Award Mr. Malice unpaid monies owed to him under the Collaboration Agreement and the Ghostwriter Agreement;

7.     Award Mr. Malice punitive damages for Defendants' willful conduct;

8.     Award Mr. Malice his reasonable attorneys' fees and costs incurred in bringing this suit; and

9.     All other relief deemed just and proper by the Court.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial on all issues so triable.

Dated: October 6, 2016

Respectfully Submitted,

Jay M. Wolman (JW0600)
RANDAZZA LEGAL GROUP, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
Tele:   702-420-2001
Fax:    305-437-7662
Email: ecf@randazza.com

Ronald D. Green
*Pro Hac Vice* Motion Forthcoming
RANDAZZA LEGAL GROUP, PLLC
4035 S. El Capitan Way
Las Vegas, NV 89147
Tele:   702-420-2001
Fax:    305-437-7662
Email: ecf@randazza.com

*Attorneys for Plaintiff, Michael Krechmer*
*a/k/a "Michael Malice"*

## VERIFICATION

I, MICHAEL KRECHMER, being first duly sworn, depose and say:

      1.     I am over the age of 18 years;

      2.     I am the Plaintiff in this action;

      3.     I have read the foregoing Verified Complaint and knows the contents thereof; and

      4.     The foregoing Verified Complaint is true to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 6 day of October, 2016 at White Plains .

Michael Krechmer

17